748 So.2d 970 (1999)
Robert THOMAS, Appellant,
v.
STATE of Florida, Appellee.
No. 91,020.
Supreme Court of Florida.
September 30, 1999.
*973 Nancy A. Daniels, Public Defender, and David A. Davis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Curtis M. French, Assistant Attorney General, Tallahassee, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Robert Thomas. We *974 have jurisdiction. See art. V, § 3(b)(1), Fla. Const. While we reject most of the claims of error asserted by Thomas, we reverse Thomas's convictions and remand for a new trial based upon the extreme conditions under which the jury deliberated and decided his guilt.
On April 6, 1997, Thomas was convicted of first-degree murder and subsequently sentenced to death. Thomas raises eleven claims of error on appeal.[1] We reverse based on Thomas's claim of error concerning the jury's late-night and early-morning deliberations and deadlock and the court's instructions to the jury during this time. We also address the remainder of the guilt phase claims, as they may affect the retrial of this case. However, we will not address any penalty phase issues because they are rendered moot as a result of our decision, except for one issue involving an improper comment during closing argument in the penalty phase.

JURY DELIBERATIONS
Thomas was charged with and tried for first-degree murder and other charges involving the death of Imara Skinner. The State's case against Thomas was substantially predicated upon the identification of Thomas by Skinner's companion, Monye Elvord. At trial, Thomas claimed an alibi and presented several witnesses in support thereof. The guilt phase of the trial, including the presentation of testimony and evidence by the defense, lasted from Monday, March 31, 1997, to Saturday, April 5, 1997. On Saturday afternoon, both Thomas and the State presented their closing arguments. Thereafter, the jury began its deliberations at approximately 7 p.m. Saturday night and did not recess until after 4:30 a.m. the next morning.[2] During the all-night deliberations, the jury expressed its deadlock on several occasions.
During deliberations, the jury requested that the testimony of five witnesses be read to them. However, when attorneys for both sides agreed that such a rereading would take too long, the judge denied the jury's request but informed them that if they absolutely needed it, he would provide it to them. Later on the jury requested to rehear at least a portion of the testimony of a witness who had identified Thomas and the testimony of two other witnesses who placed Thomas near the scene of the crime. The court allowed testimony of one witness to be reread.
After hearing this testimony again, the jury foreman informed the judge that the rehearing of testimony had had no effect on one member of the jury who was still unconvinced. The foreman told the judge that the jury was split eleven-to-one, but *975 he did not reveal whether it was in favor of guilt or innocence. By then, it was past midnight, and the judge informed the State and the defense that they had two options: either both parties would agree to waive sequestration of the jury and the court would recess until the next day, or the court would give a "dynamite" or Allen[3] charge contained in the Florida Standard Jury Instructions for Criminal Cases and insist that the jury continue deliberating for at least another hour. The State urged the court not to give the Allen charge. Thomas, however, requested that the Allen charge in the Standard Jury Instructions be given.
At this point, the court did not give the Allen charge but, instead, reconvened the jury and inquired if they wished to continue. The foreman again informed the court that the reread testimony had not resolved the case for the juror in disagreement with the majority. Notwithstanding his apparent decision not to give the jury the Allen charge from the Standard Jury Instructions, the judge instructed the jury:
Since you did hear the rereading of that testimony, I'm going to ask that you go back to the jury room and try one more time. And if that doesn't work, just send word out to me. But I would ask that you try to reach a verdict in this case. I can't make you reach a verdict, but I would ask that you, just go back and try one more time to come to a unanimous verdict in this case. So if you would just return to the jury room one more time, and we'll try and we'll decide where to go from there.
(Emphasis supplied.) When the jury retired, the judge told the parties that he would not declare a mistrial that night and that the only issue that remained for the court was whether the jury would be sequestered. Both parties urged the judge to sequester the jury.
Subsequently, at approximately 1:30 a.m. the judge ordered the jury back into the courtroom and told the jurors: "I realize it's been a long day and in this type of case I must do everything I can to give you an opportunity to reach a verdict in this case." The judge then informed them that he would call a recess, but in order to do so he would have to sequester them, and declared:
I know I told you this would be over Thursday, or maybe Friday, and here it is Sunday already. But I must do everything that I can to have the matter resolved so that we would not have to start from the beginning on the case, or in essence ... I just wanted to let you know that's what we're going to have to do.
(Emphasis supplied.) At this point, however, the court did not take a recess but, rather, again asked that the jurors continue their deliberations while the bailiff made arrangements for a hotel and a bus to transport them. Thereafter, at approximately 3:30 a.m., the jury was allowed a short break before it was ordered to return to the courtroom, where the foreman stated that the jurors now wanted to try to stay and reach a verdict because he felt they might be on the verge of a break through. However, the foreman declared: "If we can't reach a verdict tonight, quite honestly I don't think we'll come any closer tomorrow than we are tonight. That's just an honest opinion, sir." When this occurred, counsel for Thomas withdrew his motion to have the jury sequestered and requested that the jury be allowed to go home. However, counsel reasserted his position that under the circumstances then prevailing, any verdict rendered would be the product of oppression.
At about 4:30 a.m., while continuing to deliberate, the jury sent out another note to the court. Upon receipt of the note, counsel for Thomas moved for a mistrial because the note confirmed that the jury was still deadlocked. The State objected to a mistrial on the ground that the Allen charge from the Standard Jury Instructions *976 had not yet been read to the jury, and the State recommended that the court read it to the jury. The court denied the State's request and also denied defendant's motion for mistrial. The court then brought the jurors out and informed them they should report back later that day at 1 p.m.[4]
However, at this point, the foreman interrupted and told the court: "The discussions have broken down to open hostility. It's an unpleasant environment. Quite frankly, I don't think we'll ever reach a decision. I'm embarrassed to say that, but it is a fact." Thomas again moved for a mistrial, noticing that several jurors were crying and some had begun to leave the jury box. Finally, the judge adjourned the proceedings and instructed the jury to come back to try again, saying, "If we don't get it done, that will be the effort that we'll have to make to try to resolve this."
The jury returned later that Sunday as instructed. Then, after deliberating for only twenty minutes, the jury submitted a note requesting the court review the jury instruction on reasonable doubt and the jury's responsibility to rely on the evidence in making a decision. The judge indicated he would deny the jury's request and informed the parties that he would ask the jurors if they felt they could reach a verdict, and, if not, he would declare a mistrial and set the case for retrial. The State again requested an Allen charge from the Standard Jury Instructions, but it was not given, with the judge commenting that "[t]he Allen charge simply tells them to do what they have done for the last eight to ten hours."[5]
The judge then called the jury back into the courtroom and informed them he could not repeat the instructions they had requested. At this point, the foreperson informed the judge that the jury had gotten off to a good start and requested that they be allowed to continue deliberating. In response, the judge stated: "You could take as much time as you want to, but if you need to contact us, just let us know. But if you could work on that for a while, and we'll see where we are." A short while later, the jury reached a verdict and found Thomas guilty on all counts.[6]

LAW AND ANALYSIS
It has long been the law that a trial court should not couch an instruction to a jury or otherwise act in any way that would appear to coerce any juror to reach a hasty decision or to abandon a conscientious belief in order to achieve a unanimous position. See Jones v. State, 92 So.2d 261 (Fla.1956). In reviewing claims asserting violations of this important principle, the applicable standard of review is whether, under the totality of the circumstances, the trial judge's actions were coercive. United States v. Brokemond, 959 F.2d 206, 208 (11th Cir.1992).
In this case, we are concerned with several factors that may have combined to create an atmosphere of coercion: (1) the trial judge's repeated failure and refusal to give the balanced Allen charge from the Standard Jury Instructions; (2) the judge's repeated informal instructions urging the jury to render a decision; (3) the prevailing conditions surrounding the deliberations evidenced predominantly by the jury's deliberations into the early morning hours of the following day; and (4) the *977 jury's announcement in open court of their split vote indicating a lone holdout. Upon a complete review and examination of the circumstances in this case, we conclude that the cumulative nature of the trial judge's actions and comments under the extreme prevailing circumstances created a substantial risk of coercion, or at the very least, constituted undue pressure upon the lone holdout juror to change his or her vote.

Allen Charge vs. Informal Instructions
In order to strike a proper balance on this sensitive issue, the Supreme Court Committee on Standard Jury Instructions in Criminal Cases has carefully crafted an instruction that allows a jury to continue deliberations even after it has announced its inability to do so, where there is a reasonable basis to believe a verdict is possible, while cautioning jurors that they should not abandon their views just to get a verdict or to accommodate the majority. That standard instruction is commonly referred to as an Allen charge, based upon the United States Supreme Court case that discussed the concerns about interference with a jury's deliberations and decision.
Many Florida courts have held that instructions which exceed the parameters set out in Allen are coercive in nature and constitute fundamental or harmful error. See Young v. State, 711 So.2d 1379 (Fla. 2d DCA 1998) (judge's deviation from Allen charge was error because it gave the appearance that the jury had to render a verdict); Rodriguez v. State, 559 So.2d 678 (Fla. 3d DCA 1990) (judge's comment to jury that it had been deliberating for almost three hours over a three-witness case was fundamental error); Webb v. State, 519 So.2d 748 (Fla. 4th DCA 1988) (judge's statement that jury verdict had to be unanimous and rendered on that night was coercive and fundamental error); Heddleson v. State, 512 So.2d 957 (Fla. 4th DCA 1987) (trial judge's comments which led the jury to believe that it had to reach a verdict in the time allotted for the trial otherwise the defendant would not be retried and would escape prosecution was reversible error); Warren v. State, 498 So.2d 472 (Fla. 3d DCA 1986) (judge's comments that he did not wish to try the case again, that retrial would be very costly and that he sincerely hoped the jury would return a verdict if at all possible infected the integrity of the fact finding process and constituted fundamental error); Nelson v. State, 438 So.2d 1060 (Fla. 4th DCA 1983) (judge's comments that no one would be served by the jury's inability to reach a verdict and that the jury was wasting its time required the jury to reach a coercive verdict and constituted reversible error). Notwithstanding these decisions, other courts have held some supplemental instructions deviating from an Allen instruction not to be fundamental or reversible error. See State v. Bryan, 290 So.2d 482 (Fla.1974) (trial judge's modified instruction was a balanced charge which encouraged neither acquittal nor conviction and stated that no juror was to abandon his conscientious convictions; therefore it was not error); State v. Roberts, 616 So.2d 79 (Fla. 2d DCA 1993) (trial judge's comments to the jury, after six and one-half hours of jury deliberations, that it was very important yet not essential to reach a verdict on that day did not impermissibly coerce the guilty verdict); Tejeda-Bermudez v. State, 427 So.2d 1096 (Fla. 3d DCA 1983) (even if defendant had objected to the modified Allen charge, the judge's instruction to the jury to continue after six hours of deliberation and after reporting deadlock was not coercive and did not constitute error).
As noted, every Allen charge issue must be decided upon the particular facts and circumstances surrounding an individual case. See United States v. Taylor, 513 F.2d 70, 72 (5th Cir.1975).[7] Here, *978 Thomas requested the Allen charge from the Standard Jury Instructions after the jury had deliberated for four hours and had heard the rereading of testimony for about another hour. However, the standard Allen charge was not given. Instead, although the jurors informed the judge they were deadlocked, the judge repeatedly asked them to continue deliberating in order to consider the rereading of the testimony and urged them to reach a unanimous verdict. The judge's statements actually constituted a modified Allen instruction and, as such, must be examined together with the judge's other statements throughout the jury's deliberations and the other prevailing circumstances to determine if they combined to create a serious risk of coercion. See Watson v. Alabama, 841 F.2d 1074, 1076 (11th Cir.1988) (noting that judge's instructions should be viewed in light of the overall charge by the trial court, not in isolation).
The Allen charge contained in Florida Standard Jury Instruction (Criminal) 3.06 states in pertinent part:
I have only one request of you. By law, I cannot demand this of you, but I want you to go back into the jury room. Then, taking turns, tell each of the other jurors about any weakness of your own position. You should not interrupt each other or comment on each other's views until each of you has had a chance to talk. After you have done that, if you simply cannot reach a verdict, then return to the courtroom and I will declare this case mistried, and will discharge you with my sincere appreciation for your services.

(Emphasis added.) The record reflects that the judge's repeated instructions in this case urging the jury to try and try again after the jury was deadlocked left out precisely the important cautionary language in this standard instruction stating that the court would declare a mistrial and dismiss the jury if they tried but could not reach a verdict. Instead, in his repeated admonitions to the jury, the judge informed them he had to do everything he could to have them reach a verdict and to have the matter resolved to avoid having to start from the beginning. Complicating matters further, before the jury finally recessed in the morning, the foreman informed the court that the deliberations had broken down to open hostilities and that he believed the jury would never be able to reach a decision. In response, the judge again ordered the jury to return for more deliberations.
A somewhat similar situation arose in Young v. State, 711 So.2d 1379 (Fla. 2d DCA 1998), where the court held that the judge's deviation from the standard jury instruction by one sentence was error. In Young, the jury began its deliberations at about 5 p.m. on the second day of trial. At or near 9 p.m., the jury informed the court that as a group, they could not agree on a verdict. At that point, the trial judge decided to give the jury an Allen charge. The trial judge also decided, however, that he did not want a mistrial that night and would bring the jury back the next morning if it could not reach a verdict. Because of his intent to return the jury the following morning, the trial judge modified the standard instruction, to which defense counsel objected. As stated above, the last sentence of Florida Standard Jury Instruction (Criminal) 3.06 reads: "After you have done that, if you simply cannot reach a verdict, then return to the courtroom and I will declare this case mistried, and will discharge you with my sincere appreciation for your services." The trial judge omitted this sentence and, instead, substituted the following: "After you have done that, if you simply cannot reach a verdict, then return to the courtroom and I will discharge you for the evening."
The jury then resumed its deliberations and, approximately forty minutes later, returned a guilty verdict. Upon review, the court held that the judge had improperly *979 modified the Allen charge. See 711 So.2d at 1379. More specifically, it stated that the trial court's modification of the Allen charge did precisely what should be avoided when giving a modified Allen charge; it gave the jury the appearance that it had to reach a verdict. See id. In the case at bar, the judge's instructions were not nearly as similar to the standard deadlock jury instructions as were the judge's instructions in Young, yet in that case, the court held them inappropriate.

Prevailing Circumstances
The judge's promise to the jury at the start of trial that it would not last past Thursday or Friday, together with the other prevailing circumstances, including the length of the deliberations, the lateness of the hour, the condition of the jurors, and the jury's disclosure of their numerical split raises additional concerns. The jury deliberated for over eight hours until past 4:30 in the morning without respite, during which the jury foreman repeatedly informed the court of the deadlock that resulted in open hostilities among the jurors.[8] In addition to the deadlock and hostilities, the record reflects that some of the jurors actually began to cry and walk off. During the course of the night, the judge requested the jury to continue deliberating on three different occasions, each time after the jurors had informed him they were deadlocked. Furthermore, although the jurors requested on several occasions to continue deliberating in the case, this did not occur until after the judge had informed the jury that they would be sequestered overnight. Hence, a jury that had apparently been promised an earlier finish faced the possibility of being sequestered indefinitely. These conditions certainly do not reflect the proper circumstances under which a jury should be deciding a capital punishment case.
In Tomlinson v. State, 584 So.2d 43, 45 (Fla. 4th DCA 1991), the court held that it is per se reversible error to repeat a deadlock jury instruction and send a jury back for further deliberations after it has announced a second deadlock. Although it has been stated that the very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves, see Allen, 164 U.S. at 501, 17 S.Ct. 154, hostilities ultimately evidenced by crying jurors are hardly indicative of reliable deliberations.

Identification of Vote
Another circumstance of critical concern is the jury foreman's announcement to the judge in open court of the jury's eleven to one numerical split. Subsequently, the one juror in the minority was referred to as "the holdout." Although this information was not requested by the judge, its disclosure was fraught with the danger that any further instruction to deliberate might be construed as pressure on the single "holdout" to give in. We have recently reiterated that the better practice is for the trial judge to admonish the jury at the outset of deliberations that they should not indicate how they stand during their deliberation. See Scoggins v. State, 726 So.2d 762, 767 (Fla.1999). Further, a judge, consciously or subconsciously, may be influenced by the knowledge that there is a lone holdout to insist that the jury continue deliberating in order to reach a verdict. The apparent temptation is that the single holdout may give in at any time.
The disclosure of the numerical split raises great concern in this case because from the jury's requests to rehear testimony it appears that the holdout juror was concerned with the accuracy and reliability of the witness's identification of Thomas. This was Thomas's primary defense and the major issue in this capital punishment *980 case. In addition, Thomas points out that the same exact eleven-to-one split occurred during the penalty phase, possibly indicating that the same juror who was holding out during the guilt phase continued to hold out at the penalty phase where a unanimous vote was not required.
In sum, we conclude that the exhausting and pressured circumstances reflected in this record are simply not proper conditions for any jury, much less one in a capital punishment case, to resolve an issue of guilt or innocence. See Ferrer v. State, 718 So.2d 822, 826 (Fla. 4th DCA) (stating that continuing court proceedings into the late evening hours unreasonably and unnecessarily exhausts jurors and may deny a party effective or meaningful representation of counsel), review denied, 728 So.2d 204 (Fla.1998). Obviously, jury deliberations in a criminal case are perhaps the most critical and sacred parts of a trial, and care should be taken to ensure that those deliberations are conducted in such a way that there is no question of their reliability. A coerced verdict in a criminal case deprives the accused of a fair and impartial trial and is contrary to the mandate of the Declaration of Rights of the Constitution of the State of Florida. See Webb v. State, 519 So.2d 748, 749 (Fla. 4th DCA 1988). While we recognize that trial judges have broad discretion in the conduct of trials, see Galbut v. Garfinkl, 340 So.2d 470, 473 (Fla.1976), the totality of the circumstances surrounding the jury's deliberations here appears to have rendered the jury's verdict unreliable. Accordingly, because we cannot conclude that the extreme circumstances prevailing here did not improperly influence the jury's verdict, we reverse Thomas's convictions and remand for a new trial. We address the remaining issues raised by Thomas as they may be relevant to the subsequent retrial of this case.

WITNESS EMOTIONAL BREAKDOWN
Thomas asserts that the trial court erred in denying his motion for mistrial when Elvord, the State's chief witness, suffered an emotional breakdown after the State asked her to identify the defendants at trial by standing next to them.[9] We have held that a ruling on a motion for mistrial is within the trial court's discretion and should not be reversed absent an abuse of that discretion. See Hamilton v. State, 703 So.2d 1038, 1041 (Fla.1997), cert. denied, 524 U.S. 956, 118 S.Ct. 2377, 141 L.Ed.2d 744 (1998); Merck v. State, 664 So.2d 939, 941 (Fla. 1995). A mistrial is appropriate only where the error is so prejudicial as to vitiate the entire trial. See Hamilton, 703 So.2d at 1041; Buenoano v. State, 527 So.2d 194, 198 (Fla.1988). It has been long established and continuously adhered to that the power to declare a mistrial and discharge the jury should be exercised with great care and caution and should be done only in cases of absolute necessity. See Salvatore v. State, 366 So.2d 745, 750 (Fla.1978). In reviewing motions for mistrial dealing with emotional outbursts from witnesses, appellate courts should defer to trial judges' judgments and rulings when they cannot glean from the record how intense a witness's outburst was. See Arbelaez v. State, 626 So.2d 169, 176 (Fla. 1993); Torres-Arboledo v. State, 524 So.2d 403, 409 (Fla.1988); Justus v. State, 438 So.2d 358, 366 (Fla.1983).
In the instant case, the trial court did not abuse its discretion in failing to grant Thomas's motion for a mistrial. Immediately after the breakdown, the judge stopped the trial and removed the jury immediately, and he did not resume the trial until Elvord had gathered herself completely. Notwithstanding this conclusion, we find the identification procedure attempted here requiring the victim to *981 stand by the defendants to be unacceptable and unnecessary, especially in cases involving such intense emotions. Therefore, on remand, such an identification procedure should not be permitted.

PHOTO SPREAD IDENTIFICATION
Next, Thomas claims that the photo spread identification made by Elvord was impermissibly suggestive because two of the six individuals in the Thomas spread had appeared in a prior photo spread showed to her. The police showed Elvord photos of over 7,000 different men. However, she did not identify any of them as her assailant. Approximately two weeks after the crime, the police showed Elvord photo spreads containing six people each. On May 1, Elvord immediately picked out Thomas from the photo spread, which contained his photo for the first time.
The test to apply for suppression of an out-of-court identification is two-fold: (1) did the police use an unnecessarily suggestive procedure to obtain the out-ofcourt identification; (2) and if so, considering all the circumstances, did the suggestive procedure give rise to a substantial likelihood of irreparable misidentification. See Grant v. State, 390 So.2d 341, 343 (Fla.1980). If the police did not use an unnecessarily suggestive procedure, then the court need not consider the second part of the test. See Green v. State, 641 So.2d 391, 394 (Fla.1994); Grant, 390 So.2d at 344.
Florida law has upheld the use of photo spreads containing six individual pictures. See Lewis v. State, 572 So.2d 908 (Fla. 1990); Stephens v. State, 693 So.2d 1090 (Fla. 5th DCA 1997). Under the above stated test, Thomas's claim must fail. Detective Davis testified that he did not suggest to Elvord which photo to pick. He also testified that he did not tell her that she had to pick a photo from either spread. Although Elvord testified that Detective Davis had told her he had two suspects whose photographs he wanted her to look at, in Green we held that a photo lineup was not unnecessarily suggestive, even though the police officer told the witness that the suspect was within the six pictures that he was going to show her. Green, 641 So.2d at 394. From Detective Davis's and Elvord's testimony, it is clear that the photo spreads were not unnecessarily suggestive; therefore, the trial judge did not abuse his discretion in denying Thomas's motion to suppress Elvord's identification of Thomas.

STATEMENTS TO POLICE
Next, Thomas argues that the trial court improperly admitted his statements to police. These statements were made after Thomas was stopped for speeding and reckless driving on Interstate 10 and eventually arrested for attempting to flee. After his arrest for this incident, on April 24, Thomas signed an "Edwards notice" which provided that he did not wish to talk to police without the presence of counsel. On May 2, the police questioned Thomas about the murder of Imara Skinner. Thomas claims that as soon as the police began questioning him, he requested the presence of his attorney. However, he claims the police ignored his request and continued interrogating him. Detective Davis testified that he explained and reviewed with Thomas his constitutional rights to remain silent and to have an attorney present. He further testified that Thomas voluntarily waived these rights and gave statements providing a possible alibi.
This Court has held that an accused may not effectively invoke the right to counsel under the Fifth Amendment of the United States Constitution or Article I, section 9 of the Florida Constitution until custodial interrogation has begun or is imminent. See Cullen v. State, 699 So.2d 1009 (Fla. 1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1194, 140 L.Ed.2d 323 (1998); State v. Guthrie, 692 So.2d 888 (Fla.1997); Sapp v. State, 690 So.2d 581 (Fla.1997). In the instant case, Thomas signed the constitutional rights form on April 25, the day *982 after he was arrested for fleeing a police officer on Interstate 10. A week after his arrest, he was questioned by police and waived his Miranda rights in writing. Similarly, in Sapp, we upheld the introduction of defendant's statements when defendant was interrogated by police approximately one week after signing his initial claim of rights form.
We have held that when evidence adequately supports two conflicting theories, our duty is to review the record in the light most favorable to the prevailing theory. See Escobar v. State, 699 So.2d 988, 994 (Fla.1997); Johnson v. State, 660 So.2d 637, 642 (Fla.1995). Just because the evidence is conflicting does not in and of itself show that the State failed to meet its burden of showing by a preponderance of the evidence that the rights of the accused were knowingly and intelligently waived. See Escobar, 699 So.2d at 994; Johnson, 660 So.2d at 642. Upon a review of the record, we find no error in the trial court's denial of Thomas's motion to suppress the statements made to police.

FLIGHT EVIDENCE
Thomas also contends that the trial court erred in admitting Thomas's flight from police as relevant to show his consciousness of guilt. More specifically, he argues that no evidence links his flight from police on Interstate 10 with any belief that the police were investigating him for the murder. Furthermore, Thomas alleges that he fled from police to obtain medical assistance for his godchild.
This Court has stated that the admission of evidence is within the trial court's discretion and will not be reversed unless defendant demonstrates an abuse of discretion. See Medina v. State, 466 So.2d 1046 (Fla.1985); Jent v. State, 408 So.2d 1024 (Fla.1981). The law is well settled that "[w]hen a suspected person in any manner attempts to escape or evade a threatened prosecution by flight, concealment, resistance to lawful arrest, or other indications after the fact of a desire to evade prosecution, such fact is admissible, being relevant to the consciousness of guilt which may be inferred from such circumstance." Straight v. State, 397 So.2d 903, 908 (Fla.1981). However, we have held that in order to admit this evidence, there must be a nexus between the flight, concealment, or resistance to lawful arrest and the crime for which the defendant is being tried in that specific case. See Escobar v. State, 699 So.2d 988 (Fla.1997). Moreover, such an interpretation should be made with a sensitivity to the facts of the particular case. See Bundy v. State, 471 So.2d 9 (Fla.1985) (citing United States v. Borders, 693 F.2d 1318, 1325 (11th Cir. 1982)).
In prior cases, we have upheld the introduction of similar flight evidence as consciousness of guilt where the defendant flees from police after committing a murder. See Shellito v. State, 701 So.2d 837, 840 (Fla.1997) (even though defendant committed several robberies between the murder and his arrest, evidence that defendant resisted arrest the day after the murder was admissible as consciousness of guilt of the murder); Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990) (even though defendant escaped after being arrested for misdemeanor traffic warrants, evidence of escape could be used as consciousness of guilt of the murder); Bundy, 471 So.2d at 20 (evidence of defendant's attempt to flee officers six days after the murder was admissible as consciousness of guilt even though defendant was wanted for several murders in other states). In these cases, we upheld the introduction of the flight evidence even though the flight could have been attributed to different crimes or warrants.
In the instant case, the evidence established that police spotted Thomas eleven days after the murder driving at speeds in excess of 90 miles per hour. After being pursued for a while, Thomas eventually stopped and the officers instructed him and his passenger to show their hands. When Thomas did not respond to this request, *983 one of the officers approached the car, opened the door, and grabbed Thomas. Thomas immediately sped away, and the officer let go of his arm to avoid being dragged down the interstate. A high speed chase ensued for several miles and ended when Thomas crashed into a ditch, exited the vehicle and fled on foot before eventually being arrested. Thomas's claim that he fled from police to obtain medical assistance for his godchild who was riding in the vehicle with him lacks credibility. The evidence at trial showed that the child had been released from the hospital earlier that day and did not need emergency treatment. Moreover, during the chase, Thomas drove past the hospital and away from it instead of to it, and when his vehicle was finally stopped, he exited it and fled from the police on foot.
These facts support the trial court's admission of flight evidence to show consciousness of guilt. The flight occurred in Jacksonville, the same city of the murder, and only eleven days after the murder. Although Thomas may not have known how close police were to identifying the killer, the case had received publicity and he knew or should have known that Elvord, the other victim in this case, could probably identify him. We hold that the facts in this case present a strong nexus between Thomas's flight and the murder of Skinner; therefore, the trial court did not abuse its discretion in admitting the flight evidence. On retrial, flight evidence can again be introduced as evidence of consciousness of guilt.

JURY VIEW
Thomas also claims that the trial court erred in denying his motion for a jury view of the scene of the crime. The purpose of a jury view is to assist the jury in analyzing and applying the evidence presented at trial. See Rankin v. State, 143 So.2d 193, 195 (Fla.1962). A motion for a jury view may be granted if it appears that a useful purpose would be served. See Ferguson v. State, 158 Fla. 345, 349-50, 28 So.2d 427, 431 (1946). However, such a determination is left to the discretion of the trial judge and there is a presumption of correctness as to his rulings absent a demonstration to the contrary. See Bundy v. State, 471 So.2d 9, 20 (Fla.1985).
Thomas's motion for a jury view was denied on the ground that it would serve no useful purpose because the scene could not be substantially duplicated. The trial court found that it would be impossible to duplicate the lighting conditions as they existed on the evening of the murder because on that night, the parking lot where the murder occurred was full, it was unknown what lights were on around the lot, and Elvord's car was subsequently destroyed. In his ruling, the trial judge stated that he would allow Thomas to bring witnesses or introduce pictures of the scene taken at 3 or 3:30 in the morning, the approximate time of the kidnaping in this case. Based on his rationale, we find that the trial court did not abuse his discretion. See Bundy, 471 So.2d at 20 (holding that trial judge did not abuse his discretion in denying defendant's motion for a jury view when the defendant had ample opportunity to cross-examine the witness and the scene had changed between the time of the murder and the trial); Ferguson, 158 Fla. at 349-50, 28 So.2d at 430 (holding that the trial judge did not abuse his discretion in denying defendant's motion for a jury view requested in order to allow the jury to determine for themselves whether the witness had the opportunity to see defendant).

IMPROPER PROSECUTORIAL COMMENTS
The last guilt-phase issue we will address on its merit is Thomas's claim that the trial court erred in failing to order a new trial as a result of the prosecutor's improper comments during closing argument. The improper comments consisted of an attack on Thomas's counsel and arguments based on facts not introduced at *984 trial concerning Elvord's identification of Thomas.
In the guilt phase closing argument, the prosecutor made the following comment about Thomas's counsel: "[The state's burden of proof is] not higher because Mr. Rolle [trial counsel for Thomas] puts his arm around his client and parades around like some martyr. It's not higher because Mr. Rolle doesn't like police officers, and it's not higher because Mr. Rolle has no respect for Monye Elvord." Thomas objected to this comment, but he did not move for a mistrial.
These comments were made during the rebuttal portion of closing argument and the trial judge minimized the possible prejudice to the jury by admonishing the prosecutor to avoid personalizing the closing argument and by instructing the jury to disregard the prosecutor's statement. See Mason v. State, 438 So.2d 374, 377 (Fla.1983)(sustained objection and instruction to jury to disregard comment can reduce the prejudice that would otherwise require a reversal). Moreover, the prosecutor voluntarily apologized to the jury and told them that Thomas's counsel was a good attorney. Therefore, curative instructions were given in this case. Although we do not have to reach the question of whether these statements constituted reversible error, we emphasize that such comments are improper and should not be made.
Thomas also objects to the following comments made by the prosecutor concerning Elvord's identification of Thomas:
And Mr. Rolle wants to make a big deal out of trying to minimize the scar on the back of his neck. I don't care how much you minimize that scar on the back of his neck. It's there. It's there. I don't care how much you minimize it, you cannot change the fact that Monye Elvord is sitting in the back of that car, looking right up at that man. And you know what she saw in the rear-view mirror too, by the way.
These comments were made in response to the comment made by defense counsel that the cyst or scar on the back of Thomas's head could not have been the one Elvord described on his face. Thomas concedes he did not object to these statements. Notwithstanding the lack of objection, Thomas claims that through these comments the State tried to create and speculate about evidence it wished it had presented at trial. Furthermore, he claims that these comments, together with the comment about Thomas's counsel, were sufficient to question the reliability of the jury's verdict.
We find no merit to his claims. The courts of this state allow attorneys wide latitude to argue to the jury during closing argument. See Breedlove v. State, 413 So.2d 1, 8 (Fla.1982); Thomas v. State, 326 So.2d 413 (Fla.1975). Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments. See Breedlove, 413 So.2d at 8; Spencer v. State, 133 So.2d 729, 731 (Fla.1961). The law requires a new trial only in those cases in which it is reasonably evident that the remarks may have influenced the jury to reach a more severe verdict of guilt than it would have otherwise done. See Darden v. State, 329 So.2d 287, 289 (Fla.1976).
In the instant case, the prosecutor was not trying to mislead or confuse the jury into believing that Elvord had testified that she saw the scar on the back of Thomas's neck. Furthermore, the State introduced evidence that Elvord was sitting in the back seat of the car throughout this ordeal, and it is a logical inference that she could have seen the scar from her position in the car. Therefore, the comments about Thomas's counsel and the scar on Thomas's neck made during the guilt phase closing argument were not of such a nature as to poison the minds of the jurors or to prejudice them so that a fair and impartial verdict could not be rendered. If indeed the comments were improper, they did not reach the egregious level of the cumulative comments we have *985 relied on in the past to reverse convictions and sentences. See Gore v. State, 719 So.2d 1197 (Fla.1998); Rhodes v. State, 547 So.2d 1201 (Fla.1989); Adams v. State, 192 So.2d 762 (Fla.1966). Nevertheless, we again reiterate our close scrutiny upon prosecutors' comments during closing arguments and our continuing firm stance that improper comments by prosecutors will not be tolerated.[10]

CONCLUSION
Given the distressing conditions surrounding the jury's deliberations, we reverse Thomas's conviction and remand for a new trial consistent with our findings and discussions on the other guilt phase issues addressed herein.
It is so ordered.
HARDING, C.J., SHAW, WELLS, ANSTEAD and PARIENTE, JJ., and OVERTON, Senior Justice, concur.
NOTES
[1] These claims are: (1) the trial court erred in denying Thomas's motion for mistrial during the guilt phase jury deliberations on the grounds of failure to give an Allen charge, coerced jury instructions and jury deadlock; (2) the trial court erred in denying Thomas's motion for a mistrial after Monye Elvord suffered an emotional breakdown when the State asked her to identify her assailants by standing next to them during her testimony; (3) the trial court erred in allowing the photo spread identification made by Monye Elvord; (4) the trial court erred by not suppressing the statements made by Thomas to the police; (5) the trial court erred in allowing into evidence Thomas's flight from the police to show consciousness of guilt; (6) the trial court erred in denying Thomas's motion for a jury view; (7) the trial court erred in failing to order a new trial because of the prosecutor's improper arguments during the guilt-phase closing argument; (8) the trial court erred in allowing the State to make an improper argument during closing argument of the penalty phase; (9) the trial court erred in finding the murder of Skinner to be heinous, atrocious, and cruel; (10) the trial court erred in refusing to instruct the jury on culpable negligence as an essential element of the lesser included offense of manslaughter; and (11) the trial court erred in prohibiting Thomas from arguing in the penalty phase residual doubt as to his guilt.
[2] Coincidently, daylight savings time began at midnight (requiring changing the clocks forward one hour). When referring to specific times or time intervals during the course of the deliberations, we will refer to the old time up to 2 a.m., but will refer to the new time after 2 a.m.
[3] Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).
[4] Initially, the judge wanted to reconvene the jury at 11 a.m. However, upon the urging of both parties that the jury should get some rest, the judge directed that they reconvene at 1 p.m.
[5] The State also noted for the record that in chambers earlier that day, Thomas had withdrawn his request for an Allen charge.
[6] The jury recommended death as the penalty by the exact eleven-to-one alignment that had divided the jury before it finally reached a verdict during the guilt phase.
[7] Although it is recommended that a trial judge give an Allen charge when a jury is deadlocked, he is not required to do so. See State v. Bryan, 290 So.2d 482 (Fla.1974).
[8] The trial judge finally recessed the jury at about 4:30 a.m., and instructed them to return at 1 p.m. later that day. When we consider that some time would have to be devoted to transportation, meals, bathing, and other personal business, this "recess" hardly appears adequate to place these deliberations back on a normal track.
[9] Thomas and his codefendant were tried simultaneously in the same courtroom and by the same judge, but they had different juries.
[10] As previously mentioned, we will not address claims (9), (10) and (11) because they are moot as a result of our reversal of Thomas's conviction. However, in a continuing effort to express our intolerance for improper prosecutorial arguments and comments, we will address the State's comments during the penalty phase closing argument labeled as claim (8).

During the penalty phase closing argument, the State made the following comment to the jury: "Today is Robert Thomas' day of reckoning. I ask you to show him the same mercy that he showed to Imara Skinner on that day." Thomas concedes he did not object to this statement. Absent a contemporaneous objection, this Court will not review comments made by counsel in closing argument unless they constitute fundamental error. See Kilgore v. State, 688 So.2d 895, 898 (Fla.1996); Wyatt v. State, 641 So.2d 355, 360 (Fla.1994). In order to constitute fundamental error, improper comments made in the closing arguments of a penalty phase must be so prejudicial as to taint the jury's recommended sentence. See Wyatt, 641 So.2d at 360. While we do not need to reach the question today of whether this comment constituted fundamental error, we reiterate that asking a jury to show as much mercy to a defendant as he showed the victim is a clear example of improper prosecutorial misconduct, which constitutes error and will not be tolerated. See Urbin v. State, 714 So.2d 411 (Fla.1998); Richardson v. State, 604 So.2d 1107 (Fla.1992); Rhodes v. State, 547 So.2d 1201 (Fla.1989).