DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**EDUARDO FELIPE ALMEIDA,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D12-4482

[February 4, 2015]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Michael A. Usan, Judge; L.T. Case No. 09-001826CF10A.

Carey Haughwout, Public Defender, and James W. McIntire, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Joseph A. Tringali, Assistant Attorney General, West Palm Beach, for appellee.

WARNER, J.

During jury deliberations in appellant's trial on multiple counts of sexual battery of a minor, the jury reported that it was deadlocked. The judge gave a modified *Allen*[1] charge. Later, when the jury again reported that it could not reach a verdict, the judge required the jury to report after the weekend, at which time the judge gave a full *Allen* charge over appellant's objection. The jury then returned a verdict of guilty against the appellant. We reverse, because our case law holds that giving two *Allen* charges is per se reversible error. We also conclude that it was impermissibly coercive of the jury under the facts and circumstances of this case.

Appellant was charged with eleven counts of sexual battery, lewd or lascivious molestation, and lewd or lascivious battery on S.J.M., a male

---

[1] *Allen v. United States*, 164 U.S. 492 (1896). The full charge is currently contained in Florida Standard Jury Instruction (Criminal) 4.1 entitled "Jury Deadlock."

minor and son of appellant's girlfriend. S.J.M's mother also was employed by the appellant, thus making appellant the sole source of income for the family. S.J.M. was between the ages of seven and thirteen during the time of the alleged abuse.

At trial, S.J.M. testified that the abuse began when he observed appellant looking at pornography on his computer. He invited S.J.M. to watch it with him. This led to various incidents of sexual activity. All of this allegedly occurred while the mother was asleep in the bedroom. S.J.M. testified that his mother kept her door closed most of the time. According to S.J.M., the abuse started in Fort Lauderdale and continued when appellant, the mother, and S.J.M. moved to Jacksonville because of appellant's business. S.J.M. testified that anal penetration probably happened twenty to thirty times before the move to Jacksonville and about the same number of times in Jacksonville. Once, when the mother and S.J.M. were fighting, he blurted out that he had been molested by the appellant. His mother did not believe him, and he later denied it.

Appellant's Jacksonville business fell apart, and they moved back to Fort Lauderdale where the abuse continued, S.J.M. testified. S.J.M. was very unhappy to move back, because he preferred Jacksonville over Fort Lauderdale.

About four months after the family moved back to south Florida, the allegations against appellant surfaced through J.M., a schoolmate to whom S.J.M. revealed the abuse. He had asked J.M. not to tell anyone about it, because his mother was both financially dependent on appellant and happy with him. S.J.M. testified that he was pulled out of class at school and was told that J.M.'s mom had called the school, saying she had overheard S.J.M. and J.M. talking on the phone about the abuse.

S.J.M.'s mother testified that when the police originally revealed the allegations to her, she did not believe them. Although she had been in denial, she now believes her son. On cross, appellant established that police told the mother she "could make more problems and more difficulties for" herself if she did not "try to understand and believe the situation."

After the abuse was reported, S.J.M. was physically examined by a nurse practitioner. She found no evidence of anal penetration, no injuries or scarring of any kind around his anus. She opined that "[a]bsence of injuries does not confirm nor negate the allegation of sexual abuse." She also opined that, due to the biological properties of the rectum, it could expand to allow penetration without injury and also heal rapidly. She

noted that, at the time she examined the victim, it was "two months after the most recent incident."

Appellant called an expert witness, a doctor the state stipulated was an expert in the rectum and anal trauma. Based on reviewing the records of the state's expert, the doctor did not find anything that would indicate appellant had anal sex with S.J.M. The doctor opined that the nurse's examination was inadequate. After examining appellant and determining the size of his penis, the doctor opined that, if he had had anal sex with an eight-year-old boy, it would produce bleeding, excruciating pain, and, if it happened chronically, fissures in the child's rectum.

Both experts indicated that, if lubrication was used, injury to the anus would be less likely. S.J.M. testified that, prior to having anal sex, he would perform oral sex on appellant, thereby lubricating appellant's penis with saliva. Appellant attempted to impeach the victim with his deposition, which appellant argued was inconsistent because S.J.M. did not mention regularly performing this act for the purpose of lubrication. Appellant's expert opined that saliva was a poor lubricant and that there was no way an eight-year-old child could accept an adult penis into his anus, with only saliva as a lubricant, without causing physical trauma.

Appellant further attacked the plausibility of S.J.M.'s story by emphasizing conflicting testimony on several points. The mother and appellant testified that she usually slept with her door open, not closed as S.J.M. had testified. The mother, who did her son's laundry, testified she never saw blood or any other substance on his underwear. As to the alleged abuse in Jacksonville, appellant testified it was impossible that he had sufficient contact with S.J.M. during this time period for the abuse to have occurred as often as S.J.M. alleged, because appellant was often travelling between his offices in Orlando, Tampa, and Jacksonville.

Appellant also attempted to establish a motive for the victim to lie: that he hoped to get rid of appellant, so S.J.M. could convince his mom to move back to Jacksonville. Appellant testified the S.J.M. was "furious" about having to leave Jacksonville, "had quite a few fights with his mom," and at one point "ran away." After the move, S.J.M. constantly complained about his school in south Florida. His mother agreed that he was upset about leaving Jacksonville. On cross-examination, S.J.M. admitted that he preferred Jacksonville to south Florida. A private paper/journal entry which he wrote during an in-school suspension was introduced into evidence. In it, S.J.M. referred to Jacksonville as heaven and Fort Lauderdale as hell. The in-school suspension when this note was written

3

occurred just before S.J.M.'s conversations with his school friend, which led to the reporting of the alleged abuse.

Perhaps most importantly, counsel asked S.J.M. whether appellant was circumcised, and he said yes. Both appellant and his expert witness, a doctor who had examined him, testified that appellant was not circumcised. The doctor opined appellant's penis could not be mistaken for a circumcised one unless it was fully erect.

The jury deliberated for approximately a day and a half, and then sent out a note that read: "We feel that at this time we the jury have reach[ed] an impass, [sic] which we feel will prevent us from reaching a unanimous decision. How should we proceed?" The state asked the court to give the jury an *Allen* charge; appellant's counsel stated he was "unfamiliar with that" because he had "never had a hung jury." After discussing with counsel, and neither side objecting, the court advised the jury: "Please continue to deliberate until you reach unanimous verdicts or until you advise the court that you are 'hopelessly deadlocked.'"

Later that day, a Friday, the jury sent out another note stating: "At this time, we [the] jury advise the court that we are 'hopelessly deadlocked.'" After a discussion with the lawyers, the court called the jury out and told them: "Ladies and Gentlemen, I do have your note. So there is one further instruction that I'm going to give you. However, I'm going to have to give you that instruction on Monday." He directed them, "Do not discuss the case over the weekend. Clear your minds. Come in refreshed."

When the trial reconvened on Monday morning, appellant's counsel objected to the giving of the *Allen* charge. He maintained that the court had given a modified *Allen* charge to the jury, after which the jury maintained that they were hopelessly deadlocked. As a matter of law, he argued, the court had to declare a mistrial. The court denied the mistrial because it did not believe that its prior instruction was a modified *Allen* charge. The court then charged the jury as follows:

> Before we broke you sent out a note indicating that you believed you were hopelessly deadlocked. I know all of you have worked hard to try to find a verdict in this case. It, apparently, has been impossible for you so far.
> Sometimes an early vote before discussion can make it hard to reach an agreement about the case later. A vote not discussed might make it hard to see all sides of the case.
> We are all aware that it's legally permissible for a jury to disagree. There are two things that the jury can lawfully do;

4

agree on a verdict or disagree on what the facts of the case may truly be.

There is nothing to disagree about on the law. As I told you, if you have any disagreement[s] about the law, I should clear them up for you. That should be my problem and not yours. If you disagree over what you believe the evidence showed, then only you can resolve that conflict, if it is to be resolved.

I have only one request of you. I cannot demand this of you. But I want you all to go back into the jury room and then, taking turns, tell each of the other jurors about any weakness in your own position. You should not interrupt each other or comment on each other's views until each of you has a chance to talk.

After you've done that, if you simply cannot reach a verdict then return to the courtroom and I will declare this case mistried and you will be discharged with my sincere appreciation for your services.

Please, retire to continue your deliberations.

The jury then deliberated all day, asking no further questions. At the end of the day, they returned a verdict of guilty as charged on all counts. The court convicted appellant and sentenced him to life in prison on some counts, thirty years in prison on others, and fifteen years on the remaining counts, many to be served consecutively. From those convictions and sentences, appellant files this appeal.

Appellant claims that it was fundamental error to give two *Allen* charges to the jury. While we think that appellant preserved this issue by objecting to the giving of the second instruction, even if it were not preserved we have held that the giving of two such charges is fundamental error. *Rubi v. State*, 952 So. 2d 630, 633 (Fla. 4th DCA 2007) ("This court has held that it is fundamental error for the trial court to repeat a deadlock jury instruction and send a jury back for further deliberations after it has announced a second deadlock.").

An *Allen* charge, derived from *Allen v. United States*, 164 U.S. 492 (1896), "is a supplemental instruction generally given when it appears the jury is having difficulty reaching a verdict." *Roma v. State*, 785 So. 2d 1269, 1271 (Fla. 5th DCA 2001). However, "[a] coerced verdict in a criminal case infringes upon two rights guaranteed by the constitution-the right to a fair trial and the right to an impartial jury." *Id.* Thus, "[i]n giving an *Allen* instruction, a trial court must avoid: 1) coercive deadlines; 2) threats of marathon deliberations; 3) pressure for the surrender of

5

conscientiously held beliefs; and 4) any implication of a false duty to decide." *Rubi*, 952 So. 2d at 633. The propriety of "every *Allen* charge issue must be decided upon the particular facts and circumstances surrounding an individual case." *Thomas v. State*, 748 So. 2d 970, 977 (Fla. 1999).

In *Tomlinson v. State*, 584 So. 2d 43 (Fla. 4th DCA 1991), this court adopted a per se rule that a trial court commits reversible error by giving an *Allen* charge more than once. *Id.* at 44-45; *see also Thomas*, 748 So. 2d at 979 (citing *Tomlinson* with approval). There, the jury reported that it was deadlocked after eight hours of deliberation. The trial judge then read the standard jury instruction on deadlocked juries. 584 So. 2d at 43. The jury announced for a second time that it could not reach a unanimous decision. *Id.* The court sent them home for the evening, but before doing so, urged them to keep deliberating and to "say a prayer for guidance," noting, "It's not unusual after a trial of this kind to have juries deliberate one, two, three, four, five, six, seven days." *Id.* at 44. After the jurors reconvened and deliberated, they convicted the defendant. *Id.*

In reversing, our court followed the approach used in *United States v. Seawell*, 550 F.2d 1159 (9th Cir. 1977), *cert. denied*, 439 U.S. 991 (1978), and adopted a "per se rule that giving an *Allen* charge twice is reversible error." *Tomlinson*, 584 So. 2d at 44-45. *Seawell* provided the rationale for the per se rule:

> Ordinarily, the general test of whether a supplemental jury instruction is in error is to consider all the circumstances to determine if the instruction was coercive. . . . Pragmatic considerations weigh against the application of this test when an Allen charge is given more than once. A case-by-case determination would provide little, if any, guidance for a trial judge. Defendants would also face insurmountable difficulties in attempting to show prejudice. A single Allen charge, without more, stands at the brink of impermissible coercion. We believe that the protection of a defendant's right to an impartial jury compels a per se rule.

*Seawell*, 550 F.2d at 1163 (footnote omitted). This court concluded, "[I]t was fundamental error for the trial court herein to send the jury back for deliberations, after it announced a second deadlock, with the instruction given." *Tomlinson*, 583 So. 2d at 45.

Similarly, in *Rubi*, after the judge had given the standard *Allen* charge in response to jury deadlock, the jury sent out a second note that arguably

indicated deadlock.  952 So. 2d at 631-33.  On appeal, this court held: "If the second note that the jury sent out is construed to be a second announcement of deadlock, then *Tomlinson* requires reversal.  However, even if the second note does not constitute a second deadlock, the question still remains whether the circumstances showed a coerced verdict." *Id.* at 634.  The court ultimately concluded that "not only was the note an announcement of a second deadlock but the court's subsequent charge amounted to coercion" because it "pressured a holdout juror to conform to the views of his peers." *Id.*

This case is slightly different from the foregoing authority in that the court gave a modified *Allen* charge first, and then the full *Allen* charge.  Nevertheless, we conclude that this still violates the per se rule of *Tomlinson.*  The first charge constituted a modified *Allen* charge in response to a jury indication of deadlock.  *See Roma*, 785 So. 2d at 1272 (directing foreperson to continue deliberations was arguably a modified *Allen* charge); *Thomas*, 748 So. 2d at 978 (where "the jurors informed the judge they were deadlocked" and "the judge repeatedly asked them to continue deliberating . . . and urged them to reach a unanimous verdict," the "judge's statements actually constituted a modified *Allen* instruction").  Thus, the giving of the second full *Allen* charge was per se reversible error under *Tomlinson.*

Moreover, we conclude that the timing and the instructions were coercive in that they "threatened marathon deliberations" and exhorted a "false duty to decide."  The jury informed the judge of their impasse.  The judge told the jury to keep deliberating until they were "hopelessly deadlocked."  The jury continued and finally reported that they were hopelessly deadlocked.  Instead of discharging them, the court told them to return the following week, at which time the judge read them the entire *Allen* charge, which told them of their duty to reach a decision if at all possible and for them to keep deliberating.  Having reported that they were deadlocked twice, the jury could have viewed the court's additional instruction as demanding a verdict and imposing "marathon deliberations" until a verdict was reached.

This was a case in which the jury could have easily found appellant not guilty.  The entire case was based upon the accusations of S.J.M.  There was no physical evidence of the crime, and substantial evidence contradicting S.J.M.'s story.  To require the jury to continue to deliberate after twice declaring that they could not reach a unanimous verdict was coercive.

Although we need not address the remaining challenges to the verdict, we do caution the prosecutor on any retrial that the state's closing argument might have been otherwise reversible because of improper comments. In particular, the prosecutor made statements unsupported by any evidence to explain away the lack of any physical findings from the examination of S.J.M. Further, comments implying that it was the jury's civic duty to convict were also improper, as well as those comments invoking sympathy. These should be avoided in any future trial.

*Reversed and remanded for a new trial.*

TAYLOR and KLINGENSMITH, JJ., concur.

\*      \*      \*

***Not final until disposition of timely filed motion for rehearing.***