DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JAMES E. EVANS,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D16-3790

[June 6, 2018]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Glenn D. Kelley, Judge; L.T. Case No. 502014CF001788AXXXXMB.

Carey Haughwout, Public Defender, and Erika Follmer, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Don M. Rogers, Assistant Attorney General, West Palm Beach, for appellee.

WARNER, J.

Appellant challenges his convictions for sexual battery and burglary with an assault. He contends that the court erred in multiple rulings. We affirm as to all issues, but address only two. First, the court admitted a 911 call from the victim as an excited utterance. Appellant contends that the time between the incident and the call was sufficient to allow time for reflection, so that the court abused its discretion in admitting the call. Considering all the circumstances of the event, the trial court properly admitted the call. Second, appellant claims that the court erred in denying his motion for mistrial after an outburst by the victim. This too is a discretionary call by the court, and the court did not abuse that discretion.

The State charged the defendant with several counts of sexual battery and burglary with an assault of a seventy-seven-year-old woman. Appellant contended that their contact was entirely consensual.

At trial, the victim, testified that she lived alone in a senior citizens complex. On the night of the incident, she awoke to see the silhouette of

a figure in her doorway. The person grabbed her and said, "[I]t's going to be okay, don't worry." He pushed her back into her bedroom and she realized he was a stranger. He got on top of her on her bed. She was scared and thought she was going to die. The man told her he was a gentle man and would not hurt her. Trying to act calm, she asked him to have a glass of wine and talk, but he kept pushing her down. He then sexually assaulted her in multiple ways. She then asked for some water, and they both got up and went to the kitchen. She suggested that they sit in the living room and talk, because she wanted to gain his confidence. When they went in the living room, she could see his face and features. He also digitally penetrated her while in the living room. She told him she wasn't angry with him. They talked for a while, and then she gave him her business card with her cell phone number on it. She was trying to connect with him on a human level, as she knew she couldn't fight him.

After a while, he thought she was tired, and he decided to leave. He started to get dressed and realized he left his cigarettes in her bedroom. They went back to find them. As she was searching, she stepped on something by her bed. It was a knife with a fancy handle in a sheath. The man said, "[T]hat's for my protection." Then he took the knife. They walked into the kitchen, and he hugged her. He said he liked her and wanted to get to know her better. He said he was sorry, that this wasn't the way to start a relationship. She let him think she was ok with that. Then he left through the front door.

She immediately locked the door. She stood there a few seconds or minutes, frozen, not believing what had just happened. Then she called her son and told him she had been raped. The son worked about three and a half miles away, and he was there within fifteen minutes. When he arrived, he called 911, and the victim reported the incident. Police came and interviewed her, collecting evidence.

The next day a person, whom the victim recognized as her attacker, called her cell phone. He called himself "Thomas" and said he wanted to come over. She said "no," but she recognized his voice. She told police about the call. That same person called her again. She also found a pack of Marlboro cigarettes in her apartment the next day. She identified appellant in court as her attacker.

On cross-examination, defense counsel questioned the victim extensively about the incident, suggesting that she had invited appellant into her home and had initiated sexual contact. Defense counsel impeached her with statements she made to the police, including that she told the police right after the incident that she asked him to call her the

next day. Counsel questioned her on details, such as the knife and its fancy handle, noting that she had not mentioned the handle to the police or in her deposition. She also had not mentioned to the police that she had seen appellant sometime before the incident sitting on a bench near the victim's apartment complex. Nor had she mentioned in any of her prior statements that appellant had said he was a gentle man or some other details that she revealed on direct examination. The victim grew more and more upset by the tenor of the questions, stating that counsel was making her feel like the guilty one. At one point, she told counsel, "[T]his is ridiculous. I am telling you the honest to God truth." Counsel objected that the victim's answers were non-responsive, at which point the court removed the jury and sought to calm things down, telling the victim that the court understood that she was very emotional. The victim claimed counsel was asking inconsequential questions and that she was trying to be very honest. The court then took a break.

When court reconvened, cross-examination continued. Defense counsel suggested to the victim that the reason that she had not given some information to the police was that she didn't want to lie to them, as she had in fact invited appellant to her home earlier that day. Defense counsel asked whether she was the one who had initiated sexual contact, to which the victim asked why defense counsel was accusing her, as it was not true. Defense counsel then asked if, when she called her son, it was because she was embarrassed that someone might have seen the appellant in her apartment. The victim responded, "Oh no. I swear on my son's soul that everything you are saying is a lie. . . . Unbelievable. Oh, my God." Defense counsel moved to strike her response and then moved for a mistrial based upon the victim's outbursts. The court denied the mistrial, but it did instruct the jury to disregard the victim's comments.

Several police officers testified as part of the State's case. One, who arrived after the 911 call, found the victim in a state of shock or disbelief. She was shaking and crying on and off. A nurse testified to the victim's sexual assault examination, and DNA evidence linked appellant to the crime.

By matching the phone number of the person who called the victim the day after the assault, the police located appellant and created a photo line-up. The victim selected appellant's picture as similar, although she thought he looked younger in the photo. Appellant was eventually arrested for the crimes.

At the end of the State's case, the 911 tape was played for the jury. In it the victim told the dispatcher that she had been raped about twenty

3

minutes earlier. She had called her son who had come over. She was concerned that the man may still be in the area. During the call, the victim can be heard crying. She said the man had a knife. She appeared to be in shock. After the 911 call was played, the State rested.

In his defense, appellant admitted that he was in the victim's home, but maintained that their encounter, including the sexual aspects, was consensual. The victim had flirted with him earlier and invited him to her residence. She initiated the sexual relations, and after it was over, she gave him her business card with her cell phone number on it. Until a police interview a few weeks later, he had no reason to believe that the encounter was not consensual.

Appellant was convicted as charged of burglary of a structure with assault or battery, as well as three counts of sexual battery while carrying, displaying, threatening, or attempting to use a weapon, for each sexual battery charge. He was sentenced to concurrent terms of twenty-five years for each count. He now appeals.

Appellant first claims that the court erred in admitting the 911 tape because it did not meet the excited utterance exception of section 90.803(2), Florida Statutes (2013), which allows admission of "[a] statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." He argues that because the call was made twenty or thirty minutes after the offense, the victim had sufficient time to engage in reflective thought; thus, her statement could not qualify as an excited utterance.

*Stoll v. State*, 762 So. 2d 870, 873 (Fla. 2000), announced that three requirements must be met before a court can admit an excited utterance: 1) an event startling enough to cause nervous excitement; 2) the statement was made without time to contrive; 3) the statement was made while the person was still under the stress of the startling event. Appellant concedes that the incident would qualify as startling enough to cause nervous excitement; however, he contends that the interval between the event and the 911 call was long enough to allow time to contrive. As stated in *Stoll*,

> If "the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process." [citing *State v. Jano*, 524 So. 2d 660, 662 (Fla. 1988)] (quoting Edward W.

4

Clearly, *McCormick on Evidence*, § 297 at 856 (3d ed.1984)); . . . .

*Id.* (alteration added). However, there is no bright-line rule for determining whether too much time has passed for the exception to apply. *Blandenburg v. State*, 890 So. 2d 267, 270 (Fla. 1st DCA 2004). *Blandenburg* points out that the common thread running through the cases that find the statement fits within the exception, even though time passed between the event and the statement, "is that at the time of the statement, the declarants were either 'hysterical,' severely injured, or subject to some other extreme emotional state sufficient to prevent reflective thought." *Id.*

In *Akien v. State*, 44 So. 3d 152 (Fla. 4th DCA 2010), a case somewhat similar to this case, the State sought to admit, over a defense objection that it did not constitute an excited utterance, a 911 call from a victim. There, a seventeen-year-old victim had gone to bed and awakened to find a man with his hand around her neck. *Id.* at 153. He threatened to kill her if she didn't stop fighting. *Id.* He covered her head with a blanket, took her clothes off, and raped her for thirty to forty-five minutes. *Id.* He ordered her to take a shower, took a nude photo of her, and ordered her to write a note stating that the sex was consensual. *Id.* He removed the bed sheets, taking the victim's keys and asking for her cell phone number before he left. Five minutes after he left, she called her mother, who convinced her to call the police. *Id.* At trial, the defendant argued that too much time had passed between the assault and the 911 call, so that the victim could have had reflective thought. *Id.* at 154. The trial court ruled the victim's 911 call qualified as an excited utterance because the call was still made under the stress of the event. *Id.* This court agreed. The recording of the 911 call did not refute the contention that the victim was still under the stress of the rape. *Id.* at 155.

Similarly, in this case, the victim was an elderly woman. Although she called her son first, and waited until he arrived in order to call the police, the 911 call was made only about twenty minutes after the appellant left her apartment. During the call, she was crying and in shock. Further, an officer who came to the scene also described the victim as in shock. The victim sounded stunned and extremely concerned that she was still in danger. The court acted within its discretion in admitting the tape.[1]

---

[1] Moreover, it appears that the 911 call could have been admissible as non-hearsay under section 90.801(2)(b), Florida Statues, as the victim/declarant testified at the trial and was subject to cross-examination regarding her statements. The 911 call was consistent with her testimony and "offered to rebut

As a second ground for reversal, appellant argues that the court erred in denying his motion for mistrial after the outburst by the victim. A ruling on a motion for mistrial is within the trial court's discretion. "A mistrial is appropriate only where the error is so prejudicial as to vitiate the entire trial." *Hamilton v. State*, 703 So. 2d 1038, 1041 (Fla. 1997).

When the appellate court "cannot glean from the record how intense a witness's outburst was[,]" it should defer to the trial court's judgments and rulings. *See Thomas v. State*, 748 So. 2d 970, 980 (Fla. 1999). In *Thomas*, the defendant was charged with first-degree murder along with his co-defendant. The State asked the murder victim's companion to identify the defendants at trial by standing next to them. *Id.* At that point she suffered an emotional breakdown. *Id.* The Florida Supreme Court ruled that the trial court did not abuse its discretion in denying a mistrial. *Id.* The court noted that an appellate court should defer to the trial court's judgment when it cannot tell from the record how intense the witness's outburst was. In *Thomas*, after the breakdown, the judge stopped the trial, removed the jury, and did not resume until the companion had gathered herself completely. *Id.*

Unlike *Thomas*, appellant contends that the victim's emotional outburst is apparent on the record. He relies on *Colon v. State*, 191 So. 3d 985, 986 (Fla. 2d DCA 2016). There, in a capital sexual battery case, the mother of a four-year-old child who had been sexually battered was testifying. When the mother was shown a picture of the child's vaginal injuries, she stated that she needed to throw up, and then vomited into a trash can. *Id.* The mother was visibly upset and cried throughout her testimony. *Id.* The trial court denied a motion for mistrial. The appellate court reversed because the record clearly showed the severity and intensity of the mother's reaction to the photograph. *Id.* Further, the defense had sought to have the photo admitted through a physician, in order to avoid triggering the mother to have an emotional reaction, as had occurred when she viewed the photo at her deposition. *Id.* The appellate court reversed because of the lack of justification for the state's chosen trial tactic of having the mother identify the photo. The mother's response had been a "visceral" response, not simply an emotional response, and the court was on notice that it was probable that the mother would have an emotional outburst if the court allowed the state to show her the picture. *Id.* at 986-87.

---

an express or implied charge against the declarant of improper influence, motive, or recent fabrication," as defense counsel suggested quite pointedly that the victim was lying about the encounter.

6

*Colon* is unlike the present case, where the victim chastised the defense attorney for suggesting that she was lying and for asking questions which were irrelevant. The record in the present case does not indicate as extreme a response as in *Colon.* The victim merely said things such as "Oh my God" and "unbelievable" to indicate that she didn't understand why the defense would suggest that she was lying. To the contrary, it appears that after the court ordered a recess, the victim calmed herself, but after the recess ended, defense counsel commenced even more pointed questioning, challenging the victim. Unlike either *Colon* or *Thomas,* the victim's emotional outburst appears to have been directed at her indignation at being accused of lying. While the defense should be entitled to question the victim's credibility, it is not surprising that she reacted with an emotional outburst. We cannot gauge the intensity of the outburst, as it appears that it was limited to a few words. On this record, we must defer to the trial court's superior vantage point at trial, and we hold that the court did not abuse its discretion in denying the motion for mistrial. *See Thomas*, 748 So. 2d at 980.

We affirm, without further comment the remaining issues raised because they do not present any error or abuse of discretion and because all of them are harmless beyond a reasonable doubt.

For the foregoing reasons, we affirm appellant's convictions and sentences.

*Affirmed.*

CIKLIN and KLINGENSMITH, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***

7