758 So.2d 1148 (2000)
Fred WASHINGTON, Appellant,
v.
STATE of Florida, Appellee.
No. 4D98-4264.
District Court of Appeal of Florida, Fourth District.
April 12, 2000.
Rehearing denied May 17, 2000.
*1149 Richard L. Jorandby, Public Defender, and David McPherrin, Assistant Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, Steven R. Parrish, and Elaine L. Thompson, Assistant Attorneys General, West Palm Beach, for appellee.
GROSS, J.
Fred Washington appeals his convictions of first degree murder and armed robbery. We affirm, finding no unconstitutional coercion in the trial judge's failure to give an Allen[1] charge and that the defense *1150 opened the door to certain redirect examination.

The evidence at trial
On January 11, 1997, Washington, Chauncey Gallon, and Jamel Little approached the Atlantic Food Market, a convenience store, to commit a robbery. The store clerk saw them and attempted to lock the door. Washington forced the door open. The clerk fled. Washington shot the clerk with a .380 handgun.
Witness Robert James was playing a video game in the store when he heard a gunshot and saw the fleeing clerk. A hooded man with a handgun told James to lie on the floor. Washington jumped over the counter and knocked the cash register to the floor. James heard a loud crash, and then a voice yell, "Let's go." Washington split the proceeds of the robbery, which included money and lottery tickets, with Gallon and Little after they left the scene.
Officer Salvator Verini found the clerk's body face down in the parking lot. The medical examiner testified that the cause of death was a bullet piercing the lungs and aorta. A projectile was recovered from the victim's body during the autopsy. Crime scene investigator Sam Scales reassembled the cash register that had been thrown to the floor. He lifted two latent prints from the cash register. The fingerprint examiner identified a latent palm print as Washington's; she testified that the other print was Washington's right middle finger.
After learning of the identification of the two prints, two detectives questioned Washington at the Fort Lauderdale Police Department. Washington denied any involvement in the robbery; he claimed that he had never been in the convenience store. The detectives obtained a search warrant for Washington's home; the search uncovered a .380 handgun, a live.380 round of the same make found at the robbery scene, and two lottery tickets. The tickets had been distributed to Atlantic Food Market and activated on January 10, 1997.
Testing later established that the handgun found in Washington's bedroom fired the bullet that caused the death of the store clerk.
On February 3, 1997, Gallon was arrested on juvenile charges. Gallon had lived with Washington before and after the shooting. At trial, Gallon conceded that he had access to the bedroom where the police found the gun, the round of ammunition, and the lottery tickets. Gallon identified Washington as the person who shot the store clerk. During questioning by the police, Gallon admitted his involvement in several other crimes, for which he was never charged. Before Washington's trial, Gallon pled guilty to second degree murder and armed robbery. He also pled guilty to four other felonies-three counts of aggravated assault and one count of shooting into an occupied dwelling. Sentencing was scheduled after Gallon testified against Washington. Gallon hoped that he would receive less than the 23-year sentence called for by the sentencing guidelines.
During cross-examination, Washington's defense counsel extensively questioned Gallon about his involvement in several other crimes. One focus of the questioning was that Gallon committed the crimes with someone other than Washington. The defense attorney asked whether Gallon and Jamal Little had wrecked the car used in the Atlantic Farm Market robbery *1151 at the A-1 Flea Market; whether Gallon and Little had burglarized a home in Lauderdale Lakes; whether Gallon and Little had robbed a little boy at Melrose; whether Gallon and Little had committed an armed robbery of a grocery store in Hollywood; whether Gallon and Little had committed an armed robbery of a Farm Store in Tamarac; whether Gallon and Little had robbed a Super K Store in Pompano Beach; whether Gallon and Little had robbed a Publix on Davie Boulevard; whether Little fired a gun into the air at a park, and whether Gallon and Jerry Howard had committed a strong arm robbery of Kennita Wallace. As to the crime of shooting into an occupied dwelling, the defense attorney asked Gallon if he was the one with a gun. Defense counsel asked specific details about many of these offenses, such as who was carrying what weapon, who drove the vehicles involved, and who inflicted the injuries on the victims.
On redirect examination, the prosecutor filled out the details of some of the crimes the defense had explored on cross-examination to establish Washington's involvement in them, a fact omitted from the defense cross-examination. On the charge of shooting into an occupied dwelling, the prosecutor established that it was Washington who shot into the house. The prosecutor demonstrated that along with Gallon and Little, Washington had been involved in the robbery of the Farm Store in Tamarac, the Super K in Pompano Beach, and the grocery store in Hollywood.

The time frames of the trial
Jury selection in the trial began on September 14, 1998 and lasted for two and one-half days. The state and defense gave opening statements before lunch on September 16. The state presented eleven witnesses through Thursday, September 17, when the trial recessed until Tuesday, September 22.
Due to a death in one juror's family, the hospitalization of another juror, and a potential hurricane, the trial did not recommence until October 7, 1998. The state presented two additional witnesses and rested. The parties presented their closing arguments from 2:15 p.m. to 4:10 p.m. Jury instructions concluded at 4:45 p.m. One juror indicated to the trial judge that she had a doctor's appointment scheduled for 5:15 p.m. The judge told the jurors that they would shortly be taking the evening recess. He advised the jurors:
[Y]our deliberations are open ended in terms of your time. I don't want you to go back there, I don't want you to think you have to reach any verdict by 5:15. Please don't rush anything in a case of this nature.... I will give you the opportunity before we break in about a half hour to tell me what time you want to come back.
On October 8, 1998, deliberations recommenced at 9:08 a.m. The jury sent out notes requesting certain evidence, asking for a break, inquiring about lunch, and requesting a readback of the testimony of Clifford Shannon. The court had the jurors brought into the courtroom and told them that he had called for the court reporter who had taken Shannon's testimony. One juror requested a readback of the testimony of another witness, Robert James. Before sending them on a break, the judge supplied the jurors with menus and asked them to order lunch. Also, the judge cautioned the jurors about not feeling pressured to reach a decision:
We are all aware that one of you is leaving town tomorrow morning at eight o'clock and that's okay. And none of us are going to ask you to make any changes with regard to that at all.
I don't want that in any respect with the same way when I sent you in and Ms. Hoffman had a doctor's appointment yesterday to be the impedes [sic] or the point by which you decided to rush anything. The reality is if you haven't reached a verdict by then, that's fine. We'll deal with that. It's not your problem, *1152 and there would be other opportunities to continue on if that's where you are. So please I don't want in a case of this nature anyone making a rush with regard to a resolution if that's not where you are at, okay.
From 12:50 p.m. to 1:00 p. m., the court reporter read Shannon's testimony to the jury. The judge told the jury that another court reporter was preparing the testimony of the other two witnesses. At 2:30 p.m., before any readbacks of the other witnesses, the jury sent out a note that read: "We don't need the rest of the transcripts read. We are deadlocked 10-2. Helpwhat do we do now?"
The defense requested that the court read the Allen charge, Florida Standard Jury Instructions (Criminal) 3.06. The court declined to read the charge, indicating that if the jury had not reached a verdict by 4:00 p.m., that he would bring them into the courtroom for further instructions. The judge explained his thinking for the record:
In the overall scheme of things I think they haven't really been out deliberating all that long. I don't think they deliberated at all yesterday other than to work out the mechanics that's within the jury room deliberating with the exception of a break, lunch since is [sic] well not even six hours on a case that spans over a period of four weeks.
Shortly after 4:00 p.m., the jury reached a verdict. Before the verdict was published, the court spoke with the jury about various notes they had sent out between 2:30 p.m. and 4:00 p.m. First, the judge asked if he needed "to be concerned" about the note indicating a 10-2 deadlock. The foreperson responded, "No." Another note, which had not been previously discussed on the record, indicated that the jury was at a "brick wall" with an 11-1 deadlock.[2] When the judge asked if he needed to address that note, the foreperson answered, "No." The clerk published the guilty verdicts at 4:25 p.m. Other than the original request for the Allen charge, the defense raised no objection to the manner in which the trial court handled the jury's questions during deliberations.

The Allen charge issue
Washington argues that the trial court erred in not reading the Allen charge immediately after receiving the 2:30 p.m. note that the jury was deadlocked. He contends that the trial judge's failure to respond to the 2:30 p.m. note amounted to a modified Allen charge which was unduly coercive, such that it constitutes reversible error. "A coerced verdict in a criminal case infringes upon two rights guaranteed by the Florida Constitution-the right to a fair trial under the due process clause and the right to an impartial jury." Scoggins v. State, 691 So.2d 1185, 1188 (Fla. 4th DCA 1997), aff'd, 726 So.2d 762 (Fla.1999); see Art. I, §§ 9, 16, Fla. Const.
Analysis of this case is controlled by Thomas v. State, 748 So.2d 970 (Fla. 1999). There, the supreme court stated the well settled principle "that a trial court should not couch an instruction to a jury or otherwise act in any way that would appear to coerce any juror to reach a hasty decision or to abandon a conscientious belief in order to achieve a unanimous position." Id. at 976 (citation omitted). The applicable standard of review of an Allen charge issue is "whether, under the totality of the circumstances, the trial judge's actions were coercive," whether the "facts and circumstances surrounding an individual case ... combined to create a serious risk of coercion." Id.
The supreme court held that the "exhausting and pressured circumstances" in Thomas amounted to a constitutional error which rendered the jury's verdict unreliable and compelled reversal of a first degree *1153 murder conviction. Id. at 980. Among the circumstances the supreme court found to be significant were that the jury began deliberations at 7:00 p.m. on a Saturday evening and deliberated all night until a recess at 4:30 a.m. on Sunday morning. Several times, the jury expressed its deadlock. Twice, the judge sent the jury back to deliberate with a modified Allen charge that improperly failed to include that "important cautionary language in [the] standard instruction stating that the court would declare a mistrial and dismiss the jury if they tried but could not reach a verdict." Id. The judge's instructions in Thomas improperly informed the jury that the judge "had to do everything he could to have them reach a verdict and to have the matter resolved to avoid having to start from the beginning." Id. Before the 4:30 a.m. recess, the foreman informed the judge that "deliberations had broken down to open hostilities." Id. In addition to the problems with the judge's actual charge to the jury, the supreme court identified other factors significant to its decision:
The judge's promise to the jury at the start of trial that it would not last past Thursday or Friday, together with the other prevailing circumstances, including the length of the deliberations, the lateness of the hour, the condition of the jurors, and the jury's disclosure of their numerical split raises additional concerns. The jury deliberated for over eight hours until past 4:30 in the morning without respite, during which the jury foreman repeatedly informed the court of the deadlock that resulted in open hostilities among the jurors. In addition to the deadlock and hostilities, the record reflects that some of the jurors actually began to cry and walk off. During the course of the night, the judge requested the jury to continue deliberating on three different occasions, each time after the jurors had informed him they were deadlocked. Furthermore, although the jurors requested on several occasions to continue deliberating in the case, this did not occur until after the judge had informed the jury that they would be sequestered overnight. Hence, a jury that had apparently been promised an earlier finish faced the possibility of being sequestered indefinitely. These conditions certainly do not reflect the proper circumstances under which a jury should be deciding a capital punishment case.
Id. (footnote omitted).
Viewing the totality of the circumstances in this case, we do not find that the trial judge's failure to give the Allen charge was unconstitutionally coercive. The trial court's decision occurred in the context of a trial where he had been extremely solicitous of the jurors' comfort. The judge worked the trial around the jurors' schedules to allow personal time for family matters, illnesses, and doctor's appointments. The trial judge was careful not to create a pressured atmosphere when the jury convened to deliberate on October 8. The jury was given smoking breaks and time to order and consume lunch. Much discussion among the jurors might have been expected, since the bulk of the witnesses had testified three weeks earlier, on September 17. The court's instruction before lunch did not indicate that the jurors had to reach a verdict. No instruction from the court appeared "to coerce any juror to reach a hasty decision or to abandon a conscientious belief in order to achieve a unanimous position." Thomas, 748 So.2d at 976. The deliberations did not break down to the hostilities and tensions evident in Thomas.
There are troubling factors in this case indicative of coercion similar to those the supreme court identified in Thomas. In its notes to the court indicating deadlock, the jury indicated its numerical division. Apparently, the trial court did not admonish the jury not to indicate their numerical division. See Scoggins, 726 So.2d at 766-67.[3] *1154 Also, the jury here first indicated its deadlock after five hours; the jury in Thomas first announced its deadlock after four hours of deliberation and one hour of readback. However, these circumstances did not overwhelm the trial and outweigh the other factors mentioned above.
We do not read Thomas to require the trial judge to immediately give an Allen charge in response to a jury's indication of deadlock, or else declare a mistrial. We disagree with the dicta in Goodwin v. State, 717 So.2d 561, 562 (Fla. 2d DCA 1998), which suggests that the court has only these two options when confronted with a jury note indicating a deadlock in deliberations. Exercising its discretion, a trial judge may delay the giving of the Allen charge for a short time to allow the jurors an opportunity for further discussion without intervention or direction from the court.
There is a tension between the trial judge's obligation to the justice system to shepard a case to its final resolution and a defendant's right to have a jury verdict free of that coercion which might compel a juror to "reach a hasty decision or to abandon a conscientious belief." Thomas, 748 So.2d at 976. It is human nature to resist making a difficult decision or to avoid the give and take of the deliberative process by taking an inflexible position at the outset and then resisting those seeking to critically examine it.
For these reasons, a trial judge must have some flexibility in deciding when to give the Allen charge. There is room in the law for a trial judge to nudge a jury in the direction of a verdict by delaying the Allen charge, without withholding it so long so as to create improper coercion. If a jury were to announce a deadlock in a four week trial after five minutes of deliberations, a trial judge might properly let that initial decision simmer for a time to allow for further discussion. Once the Allen charge is given, flexibility is lost and the trial crosses the river of no return. As we held in Tomlinson v. State, 584 So.2d 43, 45 (Fla. 4th DCA 1991), it is per se reversible error to repeat a deadlock jury instruction and send a jury back for further deliberations after it has announced a second deadlock.[4]
We do not certify conflict with Goodwin, because no express and direct conflict exists. See Fla. R.App. P. 9.030(a)(2)(A)(iv). Goodwin was a case where the jury indicated a deadlock one hour and twenty minutes into deliberations. The judge told the jury to "please continue with your deliberations." 717 So.2d at 562. The defense had requested that the jury be told to "continue, if they can, with deliberations." Id. The second district reversed, holding that the deviation from Florida Standard Jury Instructions (Criminal) 3.06 raised "the very real possibility that the jurors believed that they were required to reach a verdict even if that meant compromising their positions." Id.
Unlike Goodwin, this is not a case where the judge gave an incorrect or misleading instruction, but rather was a case where the judge withheld the Allen charge. In addition, an appellate court must view the totality of the circumstances to properly *1155 address an Allen charge issue. The dearth of facts in Goodwin prevents any meaningful comparison with this case, where the failure to give the charge occurred amidst a generally non-coercive atmosphere. See Tejeda-Bermudez v. State, 427 So.2d 1096, 1097 (Fla. 3d DCA 1983) ("The fact that the jury was instructed to continue after six hours of deliberations, and after they had reported a deadlock, was not coercive.") (citations omitted).

Cross-examination of Gallon about other crimes he committed with Washington
Washington also argues that the trial court erred in allowing the prosecutor to cross-examine Chauncey Gallon about his participation with Washington in a number of criminal acts unrelated to this case. We hold that Washington opened the door to this redirect examination by his cross-examination of Gallon.
"As an evidentiary principle, the concept of `opening the door' allows the admission of otherwise inadmissible testimony to `qualify, explain, or limit' testimony or evidence previously admitted." Ramirez v. State, 739 So.2d 568, 579 (Fla. 1999), cert. den., ___ U.S. ___, 120 S.Ct. 970, 145 L.Ed.2d 841 (Jan. 18, 2000) (quoting Tompkins v. State, 502 So.2d 415, 419 (Fla.1986)). As we explained in Bozeman v. State, 698 So.2d 629, 630-31 (Fla. 4th DCA 1997):
To open the door to evidence of prior bad acts, the defense must first offer misleading testimony or make a specific factual assertion which the state has the right to correct so that the jury will not be misled. The "opening the door" concept is based on considerations of fairness and the truth-seeking function of a trial, where cross-examination reveals the whole story of a transaction only partly explained in direct examination.
(Internal citations omitted).
Defense counsel properly questioned Gallon about the crimes to which he pled and the uncharged crimes to establish his interest and bias in testifying. See, e.g., State v. Raydo, 713 So.2d 996, 1001 n. 6 (Fla.1998); Livingston v. State, 678 So.2d 895, 897-98 (Fla. 4th DCA 1996); Ehrhardt, Florida Evidence § 608.5 (1999 ed.). Where the attorney opened the door was in questioning Gallon about the details of the uncharged crimes and the other persons involved in those crimes with him, while omitting all reference to Washington. This tactic told only half of the story and created the impression that Washington was being unfairly singled out by the first degree murder prosecution, while the perpetrators of a serious crime spree in Broward County were inexplicably receiving favorable treatment. This false impression permitted the state to fill in the gaps in the truth so tactfully omitted during the cross-examination. See McCrae v. State, 395 So.2d 1145, 1151-52 (Fla.1980). While the state could properly have objected when defense counsel began to explore the details of the uncharged crimes, it was under no obligation to do so. Cf. James v. State, 388 So.2d 35, 36 (Fla. 5th DCA 1980) (noting that "[o]ften one side will allow the opposition to introduce inadmissible testimony so as to attack it on cross-examination"). We find no error in the trial judge's determination that Washington's cross-examination of Gallon opened the door to the state's redirect examination. See § 90.612, Fla. Stat. (1999).
On the remaining issue, we find no error.
AFFIRMED.
WARNER, C.J., and SHAHOOD, J., concur.
NOTES
[1] Derived from Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), Florida's version of the Allen charge is located at Florida Standard Jury Instructions (Criminal) 3.06. The supreme court described this standard charge in Thomas v. State, 748 So.2d 970, 977 (Fla. 1999):

In order to strike a proper balance on this sensitive issue, the Supreme Court Committee on Standard Jury Instructions in Criminal Cases has carefully crafted an instruction that allows a jury to continue deliberations even after it has announced its inability to do so, where there is a reasonable basis to believe a verdict is possible, while cautioning jurors that they should not abandon their views just to get a verdict or to accommodate the majority. That standard instruction is commonly referred to as an Allen charge, based upon the United States Supreme Court case that discussed the concerns about interference with a jury's deliberations and decision.
[2] The record does not reflect when the jury sent the "11-1 deadlock" note. The defense did not object to the trial court's procedure for handling the notes in the court below.
[3] In Scoggins v. State, 691 So.2d 1185, 1188 n. 3 (Fla. 4th DCA 1997), aff'd, 726 So.2d 762 (Fla.1999), we included the following as an example of an instruction telling the jury not to disclose their numerical division:

If you should desire to communicate with me at any time, please write down your message or question and pass the note to the marshal who will bring it to my attention. I will then respond as promptly as possible, either in writing or by having you returned to the courtroom so that I can address you orally. I caution you, however, with regard to any message or question you might send, that you should not tell me your numerical division at the time.
(Quoting Eleventh Circuit Pattern Jury Instructions, Criminal Cases, Instruction 12 (District Judges Assoc. 1985) (emphasis omitted)).
[4] The supreme court cited Tomlinson v. State, 584 So.2d 43 (Fla. 4th DCA 1991), with approval in Thomas v. State, 748 So.2d 970, 979 (Fla.1999).